## GLECKMAN v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.
December 24, 1926.)

No. 6506.

1. **Criminal law ☞274—Accused did not have legal right to have conviction on plea of guilty set aside.**

Accused, who entered plea of guilty at end of government's evidence, did not have legal right to have conviction set aside and to change plea to not guilty.

2. **Conspiracy ☞48—Criminal law ☞998—Complicity in conspiracy held for jury, and denial of motion to set aside sentence on plea of guilty not abuse of discretion.**

Evidence respecting guilt of accused, who pleaded guilty to indictment charging conspiracy to violate National Prohibition Act (Comp. St. § 10138¼ et seq.), held sufficient to go to jury, and court did not abuse its discretion in denying motion to set aside conviction and sentence and to change plea to not guilty.

3. **Criminal law ☞998—Contention that plea of guilty was result of overreaching by accused's attorney held not sustained, and refusal to set aside conviction not abuse of discretion.**

In prosecution for conspiracy to violate National Prohibition Act (Comp. St. § 10138¼ et seq.), evidence held not to sustain accused's contention that plea of guilty entered at close of government's evidence was result of overreaching and deception by accused's counsel, and denial of motion to set aside conviction and enter plea of not guilty was not abuse of discretion.

4. **Criminal law ☞998—Statement in reply brief that accused's trial attorney was disbarred for misconduct, alleged on motion to set aside conviction, held not sustained.**

Statement in reply brief of counsel for plaintiff in error, seeking review of denial of motion to set aside conviction on plea of guilty, on ground that plea was entered because of overreaching by accused's trial counsel, that trial counsel was disbarred for very misconduct set forth in affidavit supporting motion, held not supported by record, and falsity thereof must have been known to such counsel.

In Error to the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Leon Gleckman and others were convicted of conspiracy to violate National Prohibition Act, and the named defendant brings error. Affirmed.

Thomas V. Sullivan, of St. Paul, Minn., for plaintiff in error.

Lafayette French, Jr., U. S. Atty., of St. Paul, Minn. (William Anderson, Asst. U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

Before SANBORN, STONE, and KENYON, Circuit Judges.

STONE, Circuit Judge. This is a writ of error from a conviction on an indictment charging conspiracy to violate the National Prohibition Act (Comp. St. § 10138¼ et seq.).

This indictment covered eight men. At the end of the government's case, three of the defendants, including this plaintiff in er-

ror, pleaded guilty and the government entered a nolle as to the other five. About four months after sentence, Gleckman took action to have the judgment and sentence vacated and set aside. For this purpose there was a notice and motion to this effect supported by affidavits of Thomas V. Sullivan and of Gleckman. This motion and these affidavits were never formally filed in the clerk's office, but they seemed to have been considered by the court as the motion was overruled, and they are included, by express statement, in stipulation of counsel, in the bill of exceptions and covered by the certificate of the judge to the bill of exceptions. Therefore, we think we should regard them as having been filed for all purposes. The only point presented by this writ of error is the denial of this motion.

Sentence was on November 11, 1922. On the same date, an order was entered "staying" the execution of the sentence until December 9, 1922, "in order to give said defendants an opportunity to sue out writs of error from the United States Circuit Court of Appeals for the Eighth Circuit if they shall be so advised" and the defendants released on bond until that date. This stay was extended until December 29, 1922, as to all convicted. A further stay was later granted Gleckman alone until January 13, 1923. On January 11, 1923, a further stay was granted Gleckman until April 2, 1923, "for the purpose of allowing defendant Glickman [Gleckman] an opportunity to obtain a transcript and if so advised to prepare an appeal in said case, or take such other action as he may be advised." A further stay was granted (March 30, 1923) until April 7, 1923. Apparently, some time between March 30 and April 7 (the date is not shown because they were not formally marked as filed and there is no record entry of such filing) the above motion and supporting affidavits were deposited with the court or clerk—with which, is not clear. All of the above orders were made during the October, 1922, term. Also, during that term (which ended April 4, 1923) and presumably after March 30, although the exact date does not appear, an order was made:

"That the hearing upon said defendant's motion to set aside the judgment and sentence herein, etc., be, and the same is hereby, continued until April 21, A. D. 1923, at 10 o'clock."

On April 21, 1923, an order was made denying the above motion. Two other orders were made extending the stay until June 15, 1923. June 15, 1923, this writ of error was allowed from the order of April 21, 1923, and Gleckman released on bail.

In a technical sense, no such motion appears in this record. What does appear is a notice to the United States attorney that on March 31, 1923:

"The defendant Leon Gleckman herein, will move the said court to vacate and set aside the judgment and sentence of the court imposed upon this defendant on the 11th day of November, 1922, and will further at said time and place move the said court for leave to withdraw the plea of guilty to the charge contained in the indictment herein, upon which said sentence was based, which indictment is hereby referred to and made a part hereof, and to enter a plea of not guilty to said indictment.

"Said motion will be based and heard upon the affidavits hereto attached, and upon the indictment herein referred to, and upon the minutes, settled case or case to be settled, the charge and sentence of the court and upon all the files, pleadings, records, exhibits and proceedings had or recorded in said case.

"That said motion will be based upon the following grounds:

"I. Surprise, mistake and inadvertence, in connection with the entering of said plea of guilty at the conclusion of the government's case and without submitting defendant's case, or making a motion for dismissal.

"II. That the evidence in the case conclusively establishes that the defendant was not and is not guilty of the crime charged in the indictment.

"III. That the plea of guilty interposed by defendant's counsel was a mistake, was entered under a mistake of fact, and in ignorance on the part of defendant of its import, consequence, or the facts of the case, and without knowledge by defendant of its consequence. That said plea is inconsistent with the established facts of said case, and cannot be sustained.

"IV. That said plea is contrary to the right of the evidence in the case, and contrary to law. Thomas V. Sullivan, Attorney for Defendant Gleckman, 328 Hamm Building, St. Paul, Minn."

We will, however, treat this paper as a motion. Two supporting affidavits appear— one by Thomas V. Sullivan and one by Gleckman. The sole effect of the Sullivan affidavit is that he believes Gleckman "has a good defense on the merits herein." The affidavit of Gleckman is as follows:

"Leon Gleckman, being first duly sworn,

deposes and says that he is one of the defendants in the above entitled action; that he, with the other defendants in said proceedings, was duly tried on the 7th, 8th, 9th and 10th day of November, 1922, before the Honorable Page Morris, judge of the above court; that upon November 11, 1922, he was sentenced by said court pursuant to a plea of guilty entered in his behalf in said proceedings. That defendant was tried jointly with the other said defendants, there being no separate trials herein.

"That on November 10th, 1922, affiant's counsel consulted with affiant at the conclusion of the government's case and before the starting of affiant's defense herein. That affiant is unfamiliar with court procedure and had never been in court before this said trial. That affiant was terrified, excited and weak. That he was bewildered at the proceedings taking place before him, which he did not understand nor appreciate. That affiant was wholly unfamiliar with his rights, except that he was not guilty, and left everything to his counsel and relied entirely upon counsel. That affiant had talked to his trial counsel only twice regarding his case and had never consulted with them regarding the evidence to be introduced and his counsel had never requested him to apprise them of his defense or of any matters pertaining to the trial hereof and proceeded to try said case on the theory that affiant was innocent and that the government could not connect him with the offense. That affiant is of the Jewish race, and has in the past engaged in the business of real estate and the loaning of money.

"That on the 10th day of November, 1922, shortly after the government had closed its case, one of affiant's counsel came to affiant and stated to affiant that he must plead guilty to the charge. That affiant protested that he was not guilty, and refused to do so. That affiant's counsel thereupon stated that because of unfounded and slanderous rumors, that the government prosecutors would insist upon drastic sentences for all the defendants herein should they be found guilty, and that they would probably prevail in said recommendations. That affiant was Jewish, a real estate dealer and a money lender and all of the other defendants were Jewish and that the jury would thereby be prejudiced against him and them to his great peril and danger as well as that of his codefendants. That said codefendants would also get heavy penalties, and that affiant would be responsible for it, unless affiant assisted them by pleading guilty. That if affiant would plead guilty the indictments against the codefendants, except the defendants Mose Barnette and Sol Rosenhause would be nollied. That the evidence was overwhelming and that the defendants were nailed to the cross. That if affiant would plead guilty it would make things much better for every one and get every one much lighter sentences.

"That amid the clamor, affiant, in his excitement, ignorance and fright, was unable to think, or decide what to do. That affiant refused again and again to plead guilty, because he was and is innocent of said charge. That Mr. Hertz, one of the affiant's counsel, then came apparently from the chambers of the trial judge, slapped affiant on the back and said: 'I have had a talk with the judge and things won't be so bad.' That affiant was thereby led to believe that his interests were being protected and that before affiant realized what had happened, and without knowledge of the import of the same and without understanding that his rights had been waived, and that a conviction of the highest order was being entered in his behalf by his counsel, a plea of guilty had been entered, all of affiant's rights waived and affiant was subsequently sentenced on said plea. That affiant was not advised that he could have fared no worse if a jury had convicted him; that affiant feared that because of his race, creed and previous occupation that the jury would be unfair and prejudiced against him and that his liberty was in great jeopardy.

"That his protests of innocence to his own counsel were beaten down and set at naught. That he is innocent of the charge of which said plea of guilty was entered by his counsel, and that his defense will convince any fair jury of said fact, as affiant repeatedly informed his said counsel. That he has now discovered that his counsel failed and neglected to make proper motions for separate trials for the defendants; that they failed to put in affiant's defense; that they failed and neglected to advise affiant of his rights, immunities and privileges in the premises; that they failed and neglected to apprise affiant of his constitutional rights; that they did not inform affiant that the district attorney's recommendations as to sentence were not binding, and that the judge was the sole arbiter of that question, in case the jury found affiant guilty of said charge. That they failed and neglected to inform affiant of his remedy to make this motion to

this court, after this terrible mischief had been done, and that affiant knew of no solution to his problems until a much later date. That the entire proceedings were stampeded through.

"That affiant is innocent, can prove himself innocent, that he has made a full and complete statement of the facts relied upon by affiant for his defense to his present counsel and has been advised by his present counsel upon such statement that he has a good and complete defense upon a trial on the merits."

It appears, from the order denying the motion, that it was opposed by the government. •

This case was set for argument on January 21, 1925, at the December, 1924, term of this court. A printed brief had been filed by plaintiff in error on May 7, 1924. No brief was filed for the United States. When the case was reached for argument, Gleckman's counsel, Sullivan, presented to the court (then composed of Judges Kenyon, Scott and Stone) a confession of error, signed by the United States attorney and the assistant United States attorney, William Anderson, which had been filed January 12, 1925. That confession of error is as follows:

"The defendant in error, United States of America, consents that this court grant the relief requested by the plaintiff in error.

"At the close of all of the testimony for the government in the trial of the above case the defendant and two other defendants, through their counsel, withdrew their previous pleas of not guilty and entered a plea of guilty. The other two defendants, Barnette and Rosenhause, were sentenced to the United States penitentiary at Leavenworth and have served their sentence. This defendant was likewise sentenced, but after the sentence was imposed he filed the affidavit which is found on pages 316, 317 and 318 of the record herein. The court did not change the plea to one of not guilty, but granted a stay for this appeal, and authorized the defendant to be at large on a supersedeas bond.

"The defendant in error herein concedes that if this defendant, Glickman [Gleckman], when the government rested, would have made a motion to dismiss as to him, the same would necessarily have been granted, as there was no evidence produced or offered by the government at the trial to substantiate the charge made against the plaintiff in error herein. The plaintiff in error, being confronted with that situation, nevertheless, through his counsel, entered a plea of guilty. This plaintiff in error accounts for that by

16 F.(2d).—43

his affidavit herein referred to, and found in the record on pages 316, 317 and 318. It appears from that affidavit that the change of plea was made because of his counsel, Abe Hertz. The government is not in a position to dispute the facts set out in this affidavit, and to the contrary, believes that certain portions of the affidavit are true.

"For the above reasons the defendant in error offers no objection to the relief asked for by the plaintiff in error. Respectfully submitted, Lafayette French, Jr., United States Attorney, District of Minnesota. William Anderson, Assistant United States Atty., District of Minnesota."

The court took the case under advisement. About December 24, 1925, the United States attorney filed, in this court, a motion and affidavit for leave to withdraw the above confession of error. This motion was based upon the evidence introduced before the District Court in a summary proceeding (instituted subsequent to the above submission of this case in this court) to ascertain if contempt proceedings should be instituted against the counsel (at the trial of Gleckman) because of the matters set forth in the affidavit of Gleckman. That evidence was presented to this court in support of the motion to withdraw the confession of error and is on file in this court. That motion was granted and the confession of error withdrawn. The former submission was set aside and the case returned to the docket for argument at the May term, 1926. The government filed its brief on March 15, 1926, a reply brief was filed May 1, 1926, and the case argued and submitted on the first day of the May term.

[1] Plaintiff in error does not contend that he had a legal *right* to have the conviction set aside and to change his plea of guilty to one of not guilty. He could not successfully so contend. United States v. Bayaud (C. C.) 23 F. 721; 16 C. J. 396, and numerous citations in note 88.

[2] The contention is that the trial court abused its discretion in denying the motion. The grounds for this contention are (a) that the evidence had failed to establish the guilt of Gleckman but "on the contrary conclusively establishes that the defendant was not and is not guilty" and (b) that the affidavit of Gleckman reveals that the reason why he pleaded guilty, when he was in fact innocent, was deception and overreaching practiced by one of his counsel (Hertz) on defendant, a "terrified, excited * * * weak * * * bewildered" man who did not appreciate the situation nor understand his rights and who

was made to believe he would be convicted anyway.

This was a conspiracy case to violate the Prohibition Act. The eight men following were charged in the indictment as being parties to the conspiracy: Schwartz, Brotski, Gleckman, Louis Barnette, Mose Barnette, Joseph Rosenhause, Sol Rosenhause and Lomberg. The evidence, inter alia, showed that a large plant to redistill a nonbeverage alcoholic mixture (Bodi Rub, sometimes referred to as Alco Wash and Alco Rub in the testimony) into an alcohol suitable for beverage purposes was operated in St. Paul. Louis Barnette, Lomberg, and Joseph Rosenhause were caught in the plant in their working clothes. Sol Rosenhause was caught transporting some of the redistilled alcohol, had been seen going in and out of the building, and clothes belonging to him were found there. Mose Barnette (brother of Louis) appeared when the officers arrested Sol Rosenhause, who was driving a truck loaded with redistilled Bodi Rub, attempted to interfere therein, and later drove rapidly to the plant in an apparent effort to give warning there. Schwartz was a retail druggist. Brotski had loaned him money to buy his stock. Brotski and Gleckman were in partnership in the wall paper business in St. Paul. The main business of Gleckman was "Real Estate and Loans" and he had his office on the third floor of an office building in St. Paul. The Bodi Rub or Alco Wash was made by the Universal Medicine Company at Chicago. The method by which this plant was supplied with the very large amount of Bodi Rub used for redistilling was that it was shipped from Chicago to Schwartz (under the name of West Side Pharmacy), stored in warehouses in St. Paul and withdrawn therefrom upon orders signed by Schwartz. Schwartz received either 50 cents or $1 per case for the use of his name. Brotski had made this arrangement with Schwartz. The evidence is not convincing that Schwartz knew about the plant or who was interested in the Bodi Rub (beyond Brotski and a man Schwartz had known only as "Sol"). The plan of the conspirators was, in outline, to procure large quantities of Bodi Rub to be shipped from the maker, in Chicago, to Schwartz (the West Side Pharmacy); to get this Bodi Rub to the plant where it was redistilled and to dispose of the redistillate for beverage purposes.

From the preceding brief sketch of the evidence, it is clear that there was a conspiracy, in active execution, in which a number of persons were engaged. It is clear, also, that certain of the conspirators were ringleaders and others merely employees or tools of those leaders. Those against whom the government had proven an unmistakable case were the employees caught in the very act of executing the conspiracy. They were Louis Barnette, Joseph Rosenhause, Sol Rosenhause and Lomberg. These were engaged in the redistilling or delivery of the product. The other branch of the business was procurement of the "raw" product which was being redistilled. In that part of the business, Schwartz was a pawn. It is by no means clear that a case for the jury was not made against Schwartz, because it is positive that the mixture was ordered and shipped in his name and to him, that he permitted this to be done for a consideration and that he made no use thereof, but was knowingly acting for the convenience of and in aid of others. There is no direct evidence that he knew of this plant but it is a very natural conclusion that he knew that such quantities of alcohol mixture were not being acquired for any legitimate purpose. Brotski made this arrangement with Schwartz. While it is not readily believable that he (Brotski) did not know what was intended to be done with the mixture or that he was not a part of the plan and conspiracy, there may be a question as to whether he was a principal or merely a minor actor in the conspiracy. Also, there is direct evidence of his being engaged in transferring the same kind of packages as those found on the truck (when Rosenhause was arrested) from a truck to an automobile on several occasions about two weeks before this arrest and near where the truck was at the time of the later arrest. One of the trucks so observed bore the same license number as that driven by Rosenhause when arrested. There are several links in the evidence which connect Gleckman as being one of the leaders. Gleckman was engaged in the real estate and loan business with an office in an office building in St. Paul, 306 Globe Building. Also, he was interested in a wall paper store, with Brotski, at another place in St. Paul. At the time Sol Rosenhause was arrested as he was driving a truck loaded with the redistilled alcohol, certain papers were taken from his person. Among these, were an envelope containing two bills of lading, a small book with several pages of account therein and a slip of paper containing certain writing.

The envelope was addressed to "Mr. Leon Gleckman, 306 Globe Bldg., St. Paul, Minn."

It bore a special delivery stamp. It was postmarked: "Chicago, Aug. 1, 8:30 P. M. Ill." On the reverse side was a receiving station postmark: "St. Paul, Minn. Rec'd Aug. 2, 7:30 A. M. 1922 Commercial Station." This envelope was taken from Rosenhause in the forenoon of August 3, 1922.

Each of the bills of lading was dated Chicago, August 1, 1922, and each showed shipment by the Universal Medicine Company of "100 boxes Alco Wash" to the West Side Pharmacy, St. Paul, Minnesota.

The two leaves of account in the book (written in longhand) were as follows:

Page 1.

(Government's Exhibit N)

| | | | | | | |
|---|---|---|---|---|---|---|
| Gas | 30.80 | 6/12 | (Shepherd | 200x11 | —2200 | |
| Merchandise | 1087.50–150 doz. | | (Stabel | 50x12 | 600 | |
| " | 500.00 | 6/13 | (C. & P. | 60x11¼ | 675 | |
| Merchandise | 1450.00–200 doz. | | (Weinstein | 40x11½ | 460 | |
| Louis expense | 15.00 | 6/14 | (Phil? | 100x11½ | 1150 | |
| Salary | 420.00 | | (Goldberg | 160x11 | 1760 | |
| Merchandise | 692.00–Federal | | (CBG | 35x11 | 385 | |
| Merchandise | 2189.50–302 doz. | 6/15 | (Gold | ·90x11 | 990–55 | |
| Salary to Sam | 40.00 | | (Weins | 50x11½ | 575 | |
| Merchandise | 1137.50–LaS | 6/16 | (Gold | 95x11 | —1045 | |
| Sol | 93.10 | | | | | 25 |
| Sol | 88.00 | 6/17 | (C & P | 75x10¾ | — 806 | |
| More | 94.00 | | (M. G. | 200x10 | —2000 | |
| | 7837.40 | | (Dave? | 50x11 | — 550 | |
| Sol | More | | | 1200 | 13196.25 | |
| 1771.20 | 1771.20 | | | | 100 | |
| 93.10 | 88.00 | | | 13151 | | |
| 88.00 | 1859.20 | | | 7837.40 | $13096.25 | |
| 55.00 | 304.80 | | | 3(5313.60  5 | 55. | |
| | 1554.40 | | | 1771.20 | $13151.25 | |
| 1897.30 | | | | | | |

(Government's Exhibit M)  Page 2

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/19 | (Goldberg | 90x10  . | 900 | June 20–25 cases | 362.50 | |
| | (Sheperd | 50x11 | 550 | 21–1419 | 676.80 | |
| | (Mac | 50x12½ | 625 | LeSelle 23–2589 | 903– | |
| | | | | To Brown | | |
| | | | | 40 cases | 560– | |
| 6/20 | (Cohen & Pleason | | | Salary to Sam | 50 | |
| | | 100x10¾ | 1075 | Rent | 60 | |
| | (Stabel | 25x11½ | 287.50 | Furniture | 178.25 | |
| 6/21 | (ABG | 20x11 | 220 | Cans | 42.80 | |
| | (Goldberg | 200x10 | 2000 | 15 cases at 14/90 | 223.50 | |
| 6/22 | (Cohen & Pleason | | | Express for previous cases | 22.50 | |
| | | 100x10¾  , | 1075 | To LaS for 159 | 1431.00 | |
| | (Phil Pleason | | | Salary | 420.00 | |
| | | 60x11 | 660 | | 4930.35 | |
| | (ABGeller | 55x10½ | 577.50 | | | |
| | (Sol | 55x11 | 605 | Louis expense | 12.55 | |
| | (Weinstein | 50x11 | 550 | | 4942.90 | |
| | | | | 40 Geller | 192.00 | |
| 6/23 | (Goldberg | 190x10 | 1900 | | 5034.90 | |
| 6/24 | (Cohen & Pleason | | | | | |
| | | 230x10¾ | 2472.50 | | | |
| | (Goldberg | 185x10 | 1850. | | | |
| | | 1460 | 15347.50 | | | |
| 605– | More 1100 | | 5034.90 | | | |
| 800 | | | 3(10312.60 | | | |
| 55 | | | 3437.53 | | | |

The slip of paper was as follows:

"Leon F. Gleckman
"Real Estate & Loans
"306 Globe Building
"St. Paul, Minn.

"Give him order for Bbls.
"Deliver goods to Goldberg—(50-75) holdout
"Sol to call me at 1 o'clock
"Le Selle—case goods—"

Of this slip, the portion below the letter heading was written in longhand. A handwriting expert compared an undisputed signature of Gleckman with the writing on the above two leaves of account and on the above slip and pronounced them to be by the same person.

Existence of a conspiracy or participation therein is very often not provable with that clearness and directness as is usually present in many other crimes which are less secret in character. Here, the conspiracy, its plan and most of the participants are distinctly shown by the evidence. It is proven that large quantities of this fluid were bought in Chicago and consigned to the West Side Pharmacy. There is proof that Schwartz (who was the West Side Pharmacy) was not actually to receive or handle these shipments but that they would be so consigned and taken to warehouses in St. Paul for storage until needed, when he would give orders on the warehouses therefor. That Brotski, who made this arrangement with Schwartz, had Gleckman as his business associate in the wall paper store. That Sol Rosenhause drove the truck on which the mixture was taken to the plant and on which the redistillate was taken from the plant. That when he was arrested, while delivering the redistillate, he had on him the above envelope containing the two bills of lading. That this envelope was post marked in Chicago the evening of the day on which the bills of lading were issued in Chicago. That they were for the kind of mixture used by the conspirators. That they were made out to the West Side Pharmacy, as consignee. That the envelope was addressed to Gleckman, not at the wall paper store but his personal business office. That the letter was a special delivery letter, which required personal delivery by a postal messenger to Gleckman or at least to some one at his personal office to which it was addressed. That this truckman-conspirator had these bills of lading in this envelope in his possession when he was arrested which was the next morning after the day the letter arrived in St. Paul.

That the shipments had not arrived at the time of arrest but did a few days later. Certainly this evidence is convincing evidence that Gleckman received that envelope, with those contents, and turned it over to Rosenhause. This evidence dovetails perfectly into that part of the plan of conspiracy relating to how the mixture was secured from Chicago. Also, it clearly shows Gleckman's participation in the conspiracy. Upon no other hypothesis is it explainable why these bills of lading (performing a necessary link in an unlawful undertaking) should be sent to Gleckman and, to make sure that he in person received them, sent special delivery when it was certain that such freight shipments would not, in the normal order of things, arrive so soon after shipment as to make such speedy transmission of the bills of lading necessary. Would other conspirators have sent such documents to an innocent man who knew nothing about the conspiracy? Would an honest man have permitted such to be done?

But this is not all of the evidence as to Gleckman. On Rosenhause was found, also, the above quoted order or instruction written on the personal business letterhead of Gleckman. While this order is clearly written with the purpose that it shall not be understandable by one not on the "inside" of these transactions, yet, in the light of the other evidence, it can be seen that it refers to the transactions here involved. Another connecting link identifying this order with this conspiracy is the reference to Goldberg, whose name appears also in the "accounts" taken from Rosenhause.

Also, these accounts were clearly related to and concerned this transaction. The handwriting of these accounts and of the above order were positively testified to be the same as an undenied signature of Gleckman. Counsel for plaintiff in error is rather astute in claiming that all evidence against Gleckman depended upon this identification of writing. Such is not the case, as above shown. Even if that claim were true, the weight and credibility of that evidence is for the jury.

In the face of all the above evidence against Gleckman, it is difficult to find any basis for the statement of counsel that "the evidence wholly fails to sustain any crime upon the part of this defendant, but on the contrary conclusively establishes that the defendant was not and is not guilty of the crime charged in the indictment." We think it would have authorized submission to the

jury. At any rate, it affords no ground for the argument that Gleckman is shown to be a clearly innocent man.

[3] The other leg upon which the error of the trial court is claimed to stand is that Gleckman was overreached. This is based upon the rascality of his counsel (Hertz) and the susceptibility of Gleckman thereto. What was before the trial court which bore upon these two matters? There was the ex parte affidavit of Gleckman, who was faced with a sentence. The court was under no legal compulsion to accept that affidavit at its face value even were it the only evidence before the trial court, but it was not. The court had seen Gleckman during this trial and had opportunity (which is lacking to us) to observe whether he was an ignorant man, incapable of appreciating the situation in which he was placed or alert and comprehending. The court had, also, the evidence that he was a man of considerable business sense who conducted a real estate and loan business and also was interested in a wall paper store. The court had heard all of the evidence and knew that a convincing case had been made against at least five of the eight accused and might well have concluded that a case for submission had been made as to the other three, including Gleckman. The court knew that, at the conclusion of the evidence for the government, there had been an extended conference of counsel for the defendants, because he had recessed the court at their request. The court knew that this conference had resulted in an arrangement with the office of the United States attorney which covered the disposition of the case as to all of the defendants, because this result was placed before him when the court again convened. That result and that arrangement was that three of the accused were to plead guilty and be punished in return for the release of the other five. Of the five to be released, three were caught in the act and, as to them, the evidence was convincing as to guilt—they were mere employees or tools. As to the other two released, one (Schwartz) was, at most, a mere tool who had permitted the use of his trade-name as consignee of shipments of alcohol which he had never seen. The other (Brotski), who had made the above arrangements with Schwartz, might have been a ringleader or merely a tool or go-between for that one purpose. Of those to plead guilty, Sol Rosenhause had papers upon him which tended to show that he was more than a mere tool, but, on the contrary, a principal in the conspiracy. The actions of another (Mose Barnette), at the time of and shortly after the arrest of Sol Rosenhause tended to show his interest in the conspiracy and that he was not a mere employee. As to the third (Gleckman), the evidence tended to show that he was the one who had charge of the purchase and shipment, from Chicago, of the alcohol, of its transfer from the warehouse in St. Paul to the plant and of the bookkeeping for the conspirators and, therefore, was not a mere tool but a principal. In short, it must have been clear to the trial court that the bargain between the government and the defendants was to have the three principals take the punishment and the five who were either simply tools or doubtful principals go free. Experience teaches courts that such moves are, often, not the result of magnanimity but of stern necessity. The two (Schwartz and Brotski), who were either tools or doubtful principals, were represented by separate counsel who were not interested in the welfare of the other six accused. They might well take the stand in their own defense with a view of lessening their punishment by showing the entire conspiracy from the inside and their own minor parts therein. This might have been destructive to Gleckman as it might have made more definite and detailed his important connection with and part in the conspiracy. The other six accused had common counsel. Of these six, the three to be released (Lomberg, Louis Barnette and Joseph Rosenhause) were pawns and two of them (Louis Barnette and Joseph Rosenhause) were relatives of two (Mose Barnette and Sol Rosenhause) who were to plead guilty and secure the release of these men.

In the certain state of the proof as to most of the accused, it is difficult to see how all of the defendants could have remained silent and when any one of them took the stand there was the danger, which any lawyer could foresee, of an explosion, damaging to the entire defense and all of the defendants. Also, the charges in the affidavit of Gleckman were aimed solely at Hertz, one of three counsel for six defendants, including Gleckman. There were three counsel (Judge F. N. Dickson, Carl Cummins and A. J. Hertz) who represented Gleckman, the two Barnettes, the two Rosenhauses and Lomberg. All of these counsel were present at the trial but Cummins alone did all of the cross-examining. Not once, did Hertz ask a question or offer a suggestion which appears in this bill of exceptions. Of the six men so represented, three pleaded guilty and three were released, in accordance with the evident

arrangement between counsel for these men and for the government. It is unthinkable that such an arrangement could have been made without the active participation and acquiescence of all or a majority of these three counsel. If it had been otherwise, if it had been without the knowledge or without the consent of Judge Dickson or Mr. Cummins or both, such a situation would have shown the dominance of Hertz and have been of such beneficial weight to Gleckman that it would not have been overlooked and omitted from his affidavit. We are told, in the briefs, that Judge Dickson and Mr. Cummins are gentlemen of high character and standing and are attorneys of ability and experience. It is not to be supposed that such men could take part in negotiations of this character without being sure that their clients thoroughly understood what they (clients) were doing nor that they would permit a co-counsel to impose upon a client. Gleckman was not the only one of these six clients who pleaded guilty. Two others did so. Apparently, they understood the arrangement and its supposed advantages for they have uncomplainingly served their sentences. This arrangement included them as well as Gleckman and in the same way. It is imposing on credulity to suppose that Gleckman did not know what he was about. It may well be that the sentence was more severe than he anticipated but the court was no party to his expectations and he cannot be heard to complain because his or his counsel's (Hertz) guess as to that was not accurate. It may be added that the trial court was a judge of learning, of keen insight into human nature and of long experience in the trial of cases. We can find no basis for declaring any abuse of discretion by the trial court in denying this motion. The record abundantly supports his decision and order.

There is one matter stressed by counsel for Gleckman which has not been considered in reaching the above determination for the reason that it is no part of the record in the trial below. However, because it was so stressed, we think it proper not to pass it over without comment lest it be concluded that it has not been noted. The opening statement of the reply brief is as follows:

"Before calling the court's attention to certain inconsistencies and contradictions in the brief of defendant in error, this plaintiff in error would direct the court to a consideration of certain matters, vitally important in this case, which have developed since the filing of this defendant's former brief. Since that time the attorney for defendant Gleckman has been disbarred—barred from all practice before federal courts, for the very misconduct set forth in the affidavit in this case. It clearly appears that the aforesaid Hertz was the chief counsel for this defendant, in whom he had utmost confidence, and who is responsible for the present position of defendant. Two other attorneys figuring in the defense herein were in truth and in fact the attorneys for Hertz, his assistants, acting for him, and only nominally for this defendant, who did not employ or engage them, and with whom he had little or no intercourse during his trial or afterwards, and their relations were with Hertz, not defendant. The court will take cognizance of this fact. His disbarment absolutely corroborates Gleckman's affidavit in this matter, and proves its truth."

The desirability, even though it be not the duty, of this court referring to this matter is emphasized by the fact that attached to the affidavit of the United States attorney's motion to withdraw confession of error is a transcript of the evidence taken before Judges Cant, Molyneaux and John B. Sanborn, as judges of the Minnesota district, in a proceeding entitled "Summary Proceedings to Determine Whether or Not Contempt Proceedings should be Instituted against Certain Attorneys and Counselors Practicing Before This Court in Connection with Their Services in the Case of United States of America v. Leon Gleckman." That transcript was presented to this court in connection with that motion and is a part of the files in this case in this court. We have not considered that transcript in determining this writ of error. Whether it could properly have been so considered, we leave undetermined. We have found it unnecessary to do so because the matter as it stood before Judge Morris is deemed sufficient to sustain his order now here challenged. It would now be unnecessary to consider it except for the startling statement quoted from the reply brief of Gleckman where his counsel seeks to gain great advantage for his client from the contempt proceeding. The statement in the brief is intended to mean and does mean that the same court (though not the same judge, as Judge Morris had in the meantime died), with all three judges of the district sitting, had investigated and disbarred Hertz "for the very misconduct set forth in the affidavit in this case." We are asked to "take cognizance of this fact" and are assured that "his disbarment absolutely corroborates Gleckman's affidavit in this matter, and proves its truth."

We can safely comply with the urgent request of counsel because the transcript of evidence in the proceeding which culminated in the contempt proceeding is a record in this court and the findings and order in the contempt proceeding are records of the District Court, available and undisputable.

The above evidence, inter alia, included testimony by Judge Dickson, Mr. Cummins, Hertz and Gleckman as to what took place during the recess of court after the government had concluded its testimony in chief. There is no dispute that all of the counsel and some of the defendants (including Gleckman and the two other men who pleaded guilty) went to lunch together. For nearly two hours, this party discussed what was to be done. According to Dickson, Cummins and Hertz, the discussion was not only of the evidence before the court, but the facts as learned from these defendants and the probable effect of putting the defendants on the stand. Judge Dickson summarizes the discussion as follows:

"Well, the substance of what was talked over there and what was arrived at, was this: We thought the government had made a good case against Mose Barnette and Sol Rosenhause and it had prima facie evidence enough to warrant the court in refusing a motion to dismiss as against Gleckman, and we thought if we went to trial, and all the rest of the defendants were obliged to go on the witness stand, or were put on the witness stand, that it would result in a conviction of these three and more of the defendants. The understanding was arrived at that we would offer the district attorney the plea of these three, if he would nolle the other five."

Two (Barnette and Rosenhause) of the three defendants who were to plead guilty were also interested in releasing two of the lesser defendants who were relatives. When asked concerning his opinion as to the guilt of the defendants not pleading guilty, Mr. Cummins said:

"Well, the situation on that was a little bit different, as to some of the boys who found—who were found working in the place, running the stills, and things of that kind in the place. They were working for wages. As I understood the fact, they had no money invested in the plant, but were taking orders and directions from higher-ups and doing as they were told to do and had no real intention to violate the law. They were just ordinary laborers and just doing what they were told to do. Technically, they were in and carrying out the plan and scheme of the operation of the enterprise,

but I felt they were in a little somewhat different situation than the others, and the chances were that if some of them were tried, it would lead to a conviction of the entire crowd under the conspiracy statute. I remember one of the boys who was working in there by the day was a relative of one of the three, and he expressed himself as most anxious to save his relative, and he would be glad to plead guilty, if it would help out this other party—I am not sure whether it was Mose Barnette that had the relative."

The result of this conference was that it was determined to offer pleas of guilty by Mose Barnette and Sol Rosenhause in return for nolle as to the others and if this was not acceptable, to include Gleckman in the offer. The party returned to the courthouse and Judge Dickson and Mr. Cummins conferred with the United States attorney, who insisted that Gleckman, also, should plead guilty. These two attorneys communicated the result of this conference and were authorized to offer pleas for the three. Gleckman admits being present at the luncheon conference but says he did not appreciate its effect, took little or no part in it and was confused by the talking of so many men present, although he says he sat together with the other two who pleaded guilty. The three attorneys say he participated in the discussion and knew all that was going on. Judge Dickson expresses this as follows: "He was very active in it. As I recollect now, he was quite strong for the arrangement that we proposed." Gleckman admits knowledge of the arrangement to try to have the pleas of the other two accepted and of being told the unsuccessful result of that offer. He explains his final consent as being induced by statements of Hertz that the Judge had told him the penalty on him (Gleckman) would be light. As to that, Cummins says:

"I remember Leon Gleckman asked us if we wouldn't go back and make one more effort and see if they wouldn't let him out. He said, 'Go back to them and see if they won't let me go and accept the plea from the other two,' and I know that we did go back there at his request and ask if the district attorney was willing to let him go, with the other two, and we reported to him that the district attorney refused to let him go and take the plea of the two, and he then said, 'All right;' if we couldn't make the arrangement, he was ready to plead with the other two."

We have carefully read and considered all of the evidence in that transcript and it is convincing that Gleckman was thoroughly

informed as to the whole situation and knew what he was doing.

The above summary proceeding involved an investigation as to the conduct of all of the counsel who had represented Gleckman. The three judges filed their findings resulting from that hearing. Those findings were as follows:

"On consideration of all of the evidence so taken, and being fully advised in reference thereto, we are clearly of the opinion and do find, that the charges and statements in the said affidavit of the said Leon Gleckman imputing misconduct of his said counsel in connection with the incidents which occurred prior to the entry of said plea, are untrue; that the said Gleckman was fully and fairly advised by his said counsel with respect to all the steps taken or proposed to be taken in his said case, including the plea of guilty therein; that he was not in any way misled or deceived by his said counsel in reference thereto; that he was not subjected to any compulsion in connection therewith except as the same was involved in the giving of honest counsel therein; that said Gleckman fully understood all of the proceedings in connection with his plea of guilty in said case, and that, with such understanding, he fully acquiesced therein."

Later, a disbarment proceeding was filed against Hertz before the same three judges. The basis of this proceeding was not that Hertz had imposed upon or deceived Gleckman in connection with Gleckman's plea of guilty, but it was that Hertz had aided in preparing the affidavit of Gleckman, knowing it to be false. The court held a hearing thereon and entered an order of disbarment. This is the order to which our attention is directed in the reply brief. In this order, the court reviewed the steps in the Gleckman Case, including the conferences, after the government had concluded its case, between the three defendants who pleaded guilty and their counsel and then stated:

"That during such conferences, the proposed disposition of said case which was finally agreed to, was thoroughly discussed by the defendants and their said counsel, and was fully understood and agreed to by the said Gleckman, who was and is a man of very considerable intelligence and business experience. That throughout such conferences and at the time of the final disposition of the case the rights of the said Gleckman were fully protected and he was fully advised by his counsel who were entirely loyal to his interests. That no improper methods were employed to induce the said Gleckman

to consent to the disposition of the case which was finally agreed upon, and that on being fairly advised by his said counsel, he acquiesced therein, and that upon such acquiescence being communicated to the court, and in reliance thereon, the prosecution of the case as against the five defendants above referred to, was dismissed. That the respondent herein participated in said conferences and was fully advised in reference thereto and knew the truth, as hereinbefore set forth, of all matters which were involved therein."

The court then reviews the steps in filing the present motion and affidavit of Gleckman. Concerning the statements in the Gleckman affidavit, the court says:

"That said charges of misconduct, and said statements as to the enfeebled and frightened condition of the said Gleckman, at the times referred to and the statement that he did not know or appreciate the character of the proceedings and the effect thereof, and that he was innocent of the charge against him, and had been compelled to enter the plea of guilty against his will, were wholly untrue, and that at all of the times herein referred to, this respondent knew of their falsity and knew that if they should be presented to and be believed by the court, the effect thereof would be to practice a gross fraud upon the court and to defeat justice.

"That, notwithstanding such knowledge on the part of respondent, he counseled with and assisted the attorneys for said Gleckman, on said motion and in reference thereto, aided in the preparation of said affidavit and gave said counsel assurance that the matters in said affidavit set forth were substantially true and correct."

[4] From the above statements concerning and quotations from the evidence, findings and orders of the District Court in connection with these contempt proceedings, one thing is clear. That is, that the brazen statement in the reply brief for Gleckman—made to influence this court and made with emphasis—is absolutely false. Not only did the court not disbar Hertz because the matters concerning his conduct alleged in the Gleckman affidavit were true, but the court twice clearly and positively found they were entirely false. The disbarment was because Hertz induced and aided in preparing this false affidavit. The counsel, Thomas V. Sullivan, who signed this reply brief participated in a part of the summary proceeding and was a witness therein. He must have known the contents of the disbarment order as he

urges it upon us in his brief. He may have disbelieved the evidence introduced in the summary proceeding but there could be no question as to the contents of the above findings of the court and it is difficult to believe he did not know the truth regarding these disbarment proceedings. There was no shadow of basis nor of justification for the statement made in the reply brief by him. It was false and he must have known that it was false and he made it for the purpose of influencing this court. Such conduct does not conform to the standard of propriety and honesty required of an officer of the court.

The judgment is affirmed.