**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph B. MONTOYA, Defendant–Appellant.**

No. 90–10248.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 14, 1991.

Decided Sept. 20, 1991.

See also 908 F.2d 450.

Jan Lawrence Handzlik, Kirkland & Ellis, Los Angeles, Cal., for defendant-appellant.

John P. Panneton, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before HUG, BEEZER and NOONAN, Circuit Judges.

HUG, Circuit Judge:

Joseph B. Montoya, a former Senator for the State of California, appeals his convictions for racketeering, in violation of 18 U.S.C. § 1962(c) ("RICO") (Count I); extortion and attempted extortion under color of official right, in violation of 18 U.S.C. § 1951 ("Hobbs Act") (Counts II, VI, VII, VIII, and IX); and money laundering, in violation of 18 U.S.C. § 1956 (Count IV). We conclude that, in light of the Supreme Court's recent decision in *McCormick v. United States*, — U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), the district court's instructions to the jury did not adequately define the elements of extortion under color of official right under the Hobbs Act as required by that case. We

therefore reverse Montoya's Hobbs Act convictions. We affirm, however, Montoya's convictions for racketeering and money laundering.

## I.

### FACTS AND PROCEEDINGS

On October 10, 1989, Montoya was charged, in a superseding indictment, with one count of racketeering, eight counts of extortion under color of official right, one count of money laundering, and two counts of bribery. The charges arose from a Federal Bureau of Investigation ("FBI") "sting" operation to uncover unlawful corruption by certain members of the California legislature and their staffs.

The jury trial commenced on December 4, 1989. On January 17, 1990, after the close of the Government's case-in-chief, the district court granted Montoya's Fed. R.Crim.P. 29 motion for judgment of acquittal as to the two bribery charges, Counts III and XII. On February 2, 1990, the jury returned verdicts of guilty on the racketeering, money laundering, and five of the extortion counts, and verdicts of not guilty on three remaining extortion charges, Counts V, X, and XI.

On May 8, 1990, Montoya was sentenced under the Federal Sentencing Guidelines to 78 months imprisonment on Counts I, II, and IV, and 78 months imprisonment on Counts VI, VII, and VIII, to be served concurrently. Montoya was also sentenced to a three-year term of supervised release, and, as to Count IX, a three-year term of probation to be served concurrently with the term of supervised release. Finally, Montoya was fined $32,000, and ordered to pay restitution in the amount of $8,000. Montoya appeals all of these convictions.

## II.

### DISCUSSION

**A. *Hobbs Act Convictions (Counts II, VI, VII, VIII, IX)***

We first consider Montoya's challenges to his five convictions under the Hobbs Act, 18 U.S.C. § 1951. Montoya argues that the standards for evaluating whether conduct is sufficient to meet the required "inducement" element of the offense of extortion under color of official right are ambiguous and, under the rule of lenity, should therefore be resolved in his favor. Montoya further contends that the district court's jury instructions were improper, and that there was insufficient evidence to sustain the conviction under Count II. Finally, Montoya contends that his conviction for attempted extortion under Count II is invalid because the Government failed to show the required effect on interstate commerce. We reverse Montoya's five extortion convictions on the ground that the jury was erroneously instructed on an essential element of a Hobbs Act extortion offense as subsequently interpreted by the Supreme Court in *McCormick.*

Although *McCormick* was decided after the jury verdict and thus was not available to the district judge when he instructed the jury, we must apply the *McCormick* standards on appeal. "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases pending on direct appeal." *United States v. Hilling,* 891 F.2d 205, 207 (9th Cir.1988) (citing *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649, 661 (1987)).

### 1. The Jury Instructions

The Hobbs Act provides, in relevant part, that a person is guilty of a crime if he or she "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do...." 18 U.S.C. § 1951(a) (1988). The term "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). In *United States v. Aguon (Aguon II),* 851 F.2d 1158 (9th Cir.1988) (en banc), we held that in order to obtain a conviction under the Hobbs Act for extortion "under color of official right," the prosecution must prove the defendant in-

duced the improper payment. *Aguon II*, 851 F.2d at 1160, 1166, 1172.

The Supreme Court recently enunciated an additional requirement for a Hobbs Act conviction of extortion "under color of official right" in *McCormick v. United States.* In that case, the defendant contended that the alleged extortionate payments were received as legitimate election campaign contributions. The Supreme Court held that, in order to establish the Hobbs Act violation, the prosecution had to prove that the payments were "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick*, 111 S.Ct. at 1816. In other words, the prosecution had to prove an explicit *"quid pro quo." Id.*

In *McCormick*, the Court reversed a Hobbs Act conviction of a state legislator for extortion "under color of official right." The legislator had informed a lobbyist during a reelection campaign "that his campaign was expensive, that he had paid considerable sums out of his own pocket, and that he had not heard anything" from the constituents. After the lobbyist contacted the constituents, a number of cash payments were paid by the constituents to McCormick. McCormick neither listed any of these payments as campaign contributions nor reported the money as income on his federal tax return. It was undisputed that the payments were illegal under state law. McCormick then sponsored and advocated successfully for passage of the constituents' proposed legislation, and received an additional cash payment two weeks after the legislation was enacted.

The jury convicted McCormick on one of five charged Hobbs Act counts pursuant to instructions that informed them "that to establish a Hobbs Act violation the Government had to prove that McCormick induced a cash payment and that he did so knowingly and willfully by extortion." *Id.* at 1810. The district court further instructed the jury on the required proof with respect to the extortion charges, and defined "extortion" and other terms. *Id.* & n. 4.

In reversing the Fourth Circuit's affirmance of the conviction, the Court rejected the court of appeals' interpretation of the statute as *not* requiring proof of a *"quid pro quo,"* defined as "a promise of official action or inaction in exchange for any payment or property received," in circumstances "where the parties never intended the payments to be 'legitimate' campaign contributions." *Id.* at 1813. Instead, the Court held that such a showing is required regardless of the underlying legality of the contribution. *Id.* at 1817. Thus, only payments that "are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," or in other words, where "the official asserts that his official conduct will be controlled by the terms of the promise or undertaking," will amount to a violation of the Hobbs Act. *Id.* at 1816.

In setting forth this requirement, the Court stated:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would re-

quire statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion.

*Id.* (Citation omitted). Thus, the distinction between lawful campaign contributions and unlawful extortionate activity is discussed as the difference between "campaign contributions with anticipation of favorable future action, as opposed to campaign contributions in exchange for an explicit promise of favorable future action." *Id.* at 1881 (Scalia, J., concurring).

■ In this case, the district court gave the jury the following instructions on the required proof of a Hobbs Act offense:

> This offense requires proof that the defendant, as a public official, affirmatively did something, under color of his office, to wrongfully induce and attempt to cause the payment of money. The alleged conduct must have been committed for the purpose of inducing payment. Therefore, proof of specific conduct by the defendant demonstrating a corrupt intent to induce a payment is necessary.
>
> . . . .
>
> Inducement can take many forms, some more subtle than others, and any inducement is sufficient. *The Government is not required to prove that the defendant demanded or directly solicited the payment made or that he offered anything specific in return for it.* Inducement may be proven by circumstantial evidence, as well as by direct evidence. You may, for example, properly take into account the defendant's deeds as well as his words in determining the impression, if any, he intended to convey. (Emphasis added).

The court also provided the jury the following instruction on the requirement of specific intent:

> The crimes charged in the Hobbs Act Counts are serious crimes which require proof of specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent in this case the Government must prove that the defendant corruptly intended to induce a payment, to which he was not entitled, with knowledge that the payment would be motivated by the power of the defendant's office. Such intent may be determined from all the facts and circumstances surrounding the case.

The trial court in this case provided the jury with instructions that accurately comported with the existing law at the time as set forth by our decision in *Aguon II.*[1] Under recent Supreme Court standards as set forth under *McCormick,* however, the instructions given by the court were deficient. In *McCormick,* the Court disapproved of instructions where,

> taken as a whole, the jury was told that it could find McCormick guilty of extortion if any of the payments, even though a campaign contribution, was made by the doctors with the expectation that McCormick's official action would be influenced for their benefit and if McCormick knew that the payment was made with that expectation.

111 S.Ct. at 1817. Thus, the jury instruction would have allowed the jury to convict based on a legislator's receipt of payments where proof of an explicit promise made by the legislator that his official actions would be influenced was not specifically required. *See id.*

Similarly here, the court instructed the jury that "[t]he Government is not required to prove that the defendant demanded or directly solicited the payment made or that he offered anything specific in return for it." Although the instruction adequately took into account existing circuit law at the time relating to the required element of inducement under *Aguon II,* it removed from the jury *McCormick's* requirement that they find a *"quid pro quo,"* defined as "an explicit promise or undertaking by the

---

1. *Aguon II* requires proof that a defendant "induced" the payment. There is currently a split in the circuits as to whether inducement is a required element of the crime. *See McCormick,* 111 S.Ct. at 1813 n. 5. However, in *McCormick,* the Court found it unnecessary to consider that question because the jury had been instructed that inducement was a requirement element of the crime. *See id.*

official to perform or not to perform an official act." *Id.* at 1816.

· In finding the court's instructions inadequate in this case, we note that *McCormick* does not upset the Ninth Circuit requirement of *Aguon II* regarding the necessity of proving inducement as an element of the crime. As noted, the Court in *McCormick* expressly declined to resolve a split in the circuits over whether inducement is a required element of a Hobbs Act offense. *See* n. 1, *supra.* Instead, the Court set forth an additional requirement of a *"quid pro quo"* as an element necessary to prove extortion under color of official right under the Hobbs Act.

 In sum, Ninth Circuit and Supreme Court law require, in order to convict a defendant of a Hobbs Act violation, that an official induce the making of payments, i.e., initiate, either explicitly or implicitly, communications that inform constituents that his actions are subject to being influenced, as well as make an explicit promise to carry out official actions or inaction on behalf of constituents in exchange for the making of payments. Put another way, *Aguon II* involves how the transaction originated, whereas *McCormick* involves the nature of the bargain struck.

 We conclude that the instructions given in this case omitted an essential element of the crime of extortion under the Hobbs Act, as specified in *McCormick.* This omission is not harmless because, in light of ambiguous evidence on the existence of a *"quid pro quo,"* the omission could have allowed the jury to convict on an impermissible basis.[2] *See McCormick,* 111 S.Ct. at 1817. Accordingly, we reverse Montoya's Hobbs Act convictions on

Counts II, VI, VII, VIII, and IX of the indictment.

### 2. Effect on Interstate Commerce

 Montoya also argues that the evidence under Count II was insufficient to establish the required effect on interstate commerce. Although we reverse Montoya's conviction under Count II on other grounds, we nevertheless must address this contention to determine if a retrial on this count is precluded by the double jeopardy clause.

In Count II, Montoya was charged with "knowingly and intentionally attempt[ing] to obstruct, delay and affect commerce as that term is defined in [18 U.S.C. § 1951(b)] by extortion...."[3] The Hobbs Act requires that the extortion "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce...." 18 U.S.C. § 1951(a). We have concluded that " '[i]t is enough that the scheme, if successful, would have affected commerce.' " *United States v. Rushdan,* 870 F.2d 1509, 1512 (9th Cir.1989) (quoting *United States v. Bagnariol,* 665 F.2d 877, 894 (9th Cir.1981) (per curiam), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982)). Thus, "[a]n effect on interstate commerce is established by proof of an actual impact, however small, or in the absence of actual impact, by proof of a probable or potential impact." *Bagnariol,* 665 F.2d at 894 (citations omitted).

Here, Montoya argues that there was no potential effect on interstate commerce under Count II because his transactions were with a fictitious front company created by the FBI and an FBI undercover agent.

**2.** In his defense to several of the extortion charges, Montoya has argued that the cash payments he received were legitimate honoraria. Although *McCormick* involved claimed campaign contributions, we see no rational distinction between cash payments claimed by the · official to be lawful campaign contributions or those alleged to be legitimate honoraria. The critical question is whether the payments were induced and whether a *quid pro quo* exists, not how an official labels the payments in his defense to a charge that the payments were extorted.

**3.** 18 U.S.C. § 1951(b)(3) defines "commerce" as meaning

commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

This court rejected similar arguments raised in *Bagnariol*. *See id.* at 894–95. Montoya does not dispute the Government's assertion that the fictitious FBI company purported to come from Alabama and was seeking legislation permitting it to establish a shrimp importation business in California. We therefore reject Montoya's contention.[4]

### B. *Money Laundering Conviction (Count IV)*

■ Montoya challenges his conviction under Count IV for money laundering, in violation of 18 U.S.C. § 1956 which, in relevant part, imposes criminal penalties on

> [w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—with the intent to promote the carrying on of *specified unlawful activity*....

18 U.S.C. § 1956(a)(1)(A)(i) (1988) (emphasis added).

Count IV alleges that Montoya deposited into his personal checking account a $3,000 check he received from Peach State Capitol, a fictitious FBI front company, which was derived from the proceeds of a bribery transaction proscribed by both state and federal law. According to Montoya, however, the $3,000 check was a legitimate honorarium, permissible under state law, and was therefore not deposited into his bank account "with the intent to promote the carrying on of specified unlawful activity." *Id.*

As alleged in Count IV of the indictment, the "specified unlawful activity" in this case included violations of both federal and state law bribery, in violation of 18 U.S.C. § 666 and Cal.Penal Code § 86. The jury was instructed, however, that the "specified unlawful activity" only constituted bribery violations under state law.[5] The applicable predicate state bribery offense provides as follows:

> Every member of either of the houses composing the Legislature of this state who asks, receives or agrees to receive, any bribe, upon any understanding that his official vote, opinion, judgment or action shall be influenced thereby, or shall give, in any particular manner, or upon any particular side of any question or matter upon which he may be required to act in his official capacity, or gives, or offers or promises to give, any official vote in consideration that another Member of the Legislature shall give any such vote either upon the same or another question, is punishable by imprisonment in the state prison for two, three or four years.

Cal.Penal Code § 86 (1988).

We reject Montoya's assertion that the "spill-over effect" of his erroneous Hobbs Act convictions necessarily requires reversal of his money laundering conviction. In defining an essential element of the crime of extortion under color of official right, the Supreme Court was interpreting a federal crime under the Hobbs Act. This requirement would have no bearing on the construction of the California bribery statute alleged as the predicate "specified unlawful activity" under Count IV.

We are also not persuaded that the jury may have been confused by the erroneous instructions on the extortion counts. In

---

**4.** Montoya also challenges generally the sufficiency of the evidence to sustain his conviction under Count II. Our review of the evidence indicates there was sufficient evidence from which a jury could have found beyond a reasonable doubt that the payment was made in exchange for a promise of official action. The deficiency is that the jury was not required by the instructions to make such a determination.

**5.** Both federal and state bribery offenses comprise "specified unlawful activity" under section 1956. *See* 18 U.S.C. §§ 1956(c)(7)(D);

1956(c)(7)(A) (incorporating 18 U.S.C. § 1961(a)(A)). The predicate federal bribery offense alleged in the indictment apparently was deleted from the court's instructions because it involved the same conduct charged in a substantive federal bribery count that was dismissed by the court pursuant to Montoya's motion for judgment of acquittal. Montoya does not dispute that the predicate state bribery offense would itself constitute the requisite "specified unlawful activity" under section 1956.

instructing the jury on the money laundering charge, the court specifically stated that the offense "requires proof that the defendant knew the property involved in the transaction represented proceeds from some form of activity that constitutes a *felony under state law.*" The court also recited to the jury relevant portions of Cal.Penal Code § 86, and set forth the required elements of the offense. Montoya does not challenge these instructions on the predicate state bribery offense, and we can find no indication of any prejudice to the jury's consideration of this count resulting from the court's erroneous instructions on the separate Hobbs Act counts.

■ Montoya next contends that the unlawful conduct alleged in Count IV, his deposit of the $3,000 check into his personal bank account, did not constitute unlawful money laundering under section 1956 on two grounds: (1) that he never attempted to conceal the transaction and therefore lacked the intent to launder, disguise or otherwise thwart detection of the source or the purpose of the $3,000 he received from the constituent; and (2) the deposit of the check did not "promote the carrying on of specified unlawful activity" as required under section 1956(a)(1)(A)(i) because there was no ongoing criminal venture. Again, we disagree.

■ First, an intent to launder, disguise or thwart detection of the source or purpose of monies deposited into a bank is not a required element of the section 1956 offense for which Montoya was charged. The relevant portions of section 1956(a)(1) are divided into two sections. To satisfy the requirements of section 1956(a)(1), the evidence must establish that the defendant conducted a financial transaction which involved the proceeds of unlawful activity, that he knew that the property involved was proceeds of some form of specified unlawful activity, and that he *either* (1) "intend[ed] to promote the carrying on of specified unlawful activity" (18 U.S.C. § 1956(a)(1)(A)(i)); *or* (2) knew that the transaction was designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the

control of the proceeds of specified unlawful activity" (18 U.S.C. § 1956(a)(1)(B)(i)).

Thus, unlike subsection (B)(i) of section 1956(a)(1), the Government was not required to prove that Montoya deposited the funds "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." *See* 18 U.S.C. § 1956(a)(1)(B)(i). Instead, subsections (A)(i) and (B)(i) are set forth in the disjunctive. The Government was therefore not required to prove that, by depositing the check, Montoya had any intent to conceal, disguise or otherwise thwart detection of the $3,000 payment. *See United States v. Jackson,* 935 F.2d 832, 842 (7th Cir.1991) (noting that sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) "are aimed at different activities").

■ Montoya's second argument is that the check did not involve the proceeds of an ongoing criminal venture and therefore did not "promote the carrying on of specified unlawful activity" as required under section 1956(a)(1)(A)(i). According to Montoya, the deposit of the check could not have "promoted" the unlawful activity, namely the bribe, because the activity had been completed upon receipt of the check from the undercover FBI Agent. We are unpersuaded.

Instead, we agree with the Government that Montoya could not have made use of the funds without depositing the check. Moreover, depositing the check provided an opportunity for Montoya to carry out the illegal bribery by characterizing the funds as a legitimate honorarium. In sum, we conclude that there was sufficient evidence from which the jury could find beyond a reasonable doubt that the deposit of the check amounts to an "intent to promote the carrying on of" the specified unlawful activity, in this case the bribery, within the meaning of section 1956(a)(1)(A)(i).

■ Finally, Montoya challenges the sufficiency of the evidence of the predicate state bribery offense to support his conviction under section 1956. As noted above, Montoya maintains that payment of the

$3,000 check amounted to payment of a legitimate honorarium that was permissible under state law. We conclude that evidence presented at trial, viewed in the light most favorable to the Government, more than adequately supports the jury's guilty verdict.

It is undisputed that the $3,000 payment to Montoya was made by FBI undercover Agent George Miller, who was posing as the owner of Peach State Capitol, a fictitious Alabama-based shrimp company that was lobbying for passage of certain legislation. It is also undisputed that Montoya was a member of the legislative committee that was considering the bill, and ultimately voted in favor of its passage in the state senate.

Additional evidence was presented from which a jury could reasonably conclude that Montoya received the payment with the "understanding that his official vote, opinion, judgment or action [would] be influenced...." Cal.Penal Code § 86. For example, evidence revealed that John Shahabian, a senate staffer working as an undercover informant for the FBI, was told by another member of the California Senate that Montoya expected a payment of about $2,500 to insure his support of the legislation. Further evidence revealed that Montoya, in anticipation of a meeting with the owner of the company seeking the legislation, set a payment figure at $3,000, commenting that "[y]ou don't wanna appear ridiculous." Two days later, Montoya moved the bill before the Banking and Commerce Committee, and voted for its passage. Finally, evidence was presented that, about a week later, during a meeting between Montoya, Shahabian, and Agent Miller, Miller paid Montoya the $3,000 and commented to Montoya and Shahabian that "getting it out of that blasted committee is worth about ten times that." It is undisputed that Montoya deposited the check into his personal checking account.

Based on this and other evidence of bribery presented at trial, we conclude there was sufficient evidence from which a jury could find beyond a reasonable doubt that Montoya engaged in unlawful money laundering, in violation of 18 U.S.C. § 1951(a)(1)(A)(i).

### C. *RICO Conviction (Count I)*

Montoya also challenges his racketeering conviction under 18 U.S.C. § 1962(c) based on the "spill-over" effect of the erroneous Hobbs Act convictions. We conclude that our rejection of this contention is even more compelling than our denial of the same argument raised by Montoya regarding his challenge to his money laundering conviction.

The RICO count specified eleven separate predicate racketeering acts. The jury was provided with a special verdict form that listed the first eight of these predicate acts. The jury specifically found that Montoya had committed predicate acts one, and three through six, and had not committed predicate acts two, seven, and eight. Each of the five predicate acts which the jury found Montoya had committed alleged violations of the state bribery law under Cal.Penal Code § 86.[6]

The jury's delineation of their verdicts as to each of these predicate acts clearly indicates that the jury was not confused and therefore not prejudiced by the court's erroneous instructions on the Hobbs Act charges.

### D. *Defense Witness Immunity*

Montoya contends the district court erred by denying his motion to dismiss the indictment or, in the alternative, the extortion offense charge in Count VI, based on the Government's refusal to grant immunity to proffered defense witness and legislative assistant Steven English.[7] The charge of attempted extortion in Count VI and predicate racketeering act number

---

**6.** Two of the three predicate acts rejected by the jury alleged extortion under the Hobbs Act.

**7.** Although we reverse Montoya's Hobbs Act conviction on Count VI on other grounds, we nevertheless address this contention because it

may again become relevant on possible retrial, and because it involves one of the predicate state bribery acts that the jury found supported Montoya's RICO conviction under Count I.

three (state bribery) concerned legislation involving the licensing of foreign medical school graduates. According to Montoya, English's testimony would have revealed why English had mentioned a $5,000 payment to a lobbyist seeking passage of the medical school legislation, and why Montoya had not been responsible for having English make the statement. English refused to testify for the defense based on an assertion of his Fifth Amendment right.

"It is well established that a defendant has no absolute right to have a witness granted immunity." *United States v. Patterson*, 819 F.2d 1495, 1505 (9th Cir.1987) (citations omitted). "[T]he decision to grant immunity to prospective defense witnesses is left to the discretion of the executive branch." *United States v. Mendia*, 731 F.2d 1412, 1414 (9th Cir.), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 399 (1984) (citation omitted).

■ It is only if it can be shown that there has been misconduct by the prosecutor, in intentionally causing a witness to invoke his Fifth Amendment privilege, that due process requires immunity to be granted. *Patterson*, 819 F.2d at 1506; *United States v. Lord*, 711 F.2d 887, 891–92 (9th Cir.1983). In this case, there was no showing that English's decision to invoke his Fifth Amendment privilege was due in any way to coercion or prompting by the Government. Absent proof that the Government's decision not to grant English immunity was due to such prosecutorial misconduct, there was no due process violation.

### E. *Evidentiary Rulings*

■ Finally, Montoya contends the district court erred in various evidentiary rulings at trial. Specifically, Montoya argues that the court erred by (1) admitting statements made by Senator Robbins; (2) admitting statements made by various victims and witnesses to the unlawful conduct as to their state of mind; (3) admitting evi-

dence of Montoya's campaign expenditures; and (4) refusing to admit testimony of other members of the state legislature who supported the merits of the legislation and believed it was a valid bill.[8] Although evidentiary rulings are generally reviewed for an abuse of discretion, the court's construction of evidentiary rules are questions of law subject to *de novo* review. *See United States v. Owens*, 789 F.2d 750, 753 (9th Cir.1986), *rev'd on other grounds*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

■ We agree with other circuits that have held that evidence of the state of mind of a victim of a Hobbs Act extortion offense is admissible under Fed.R.Evid. 404(b). *See United States v. Blackwood*, 768 F.2d 131, 138 (7th Cir.) ("Evidence of a victim's state of mind is an essential element of the Government's case in a Hobbs Act prosecution for extortion under color of official right."; its admission "is within the sound discretion of the court") (citation omitted), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985); *United States v. Dozier*, 672 F.2d 531, 542 (5th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982). In this case, the tape recordings of Senator Robbins, as well as the victim testimony, were properly admitted to show that victims of the alleged extortion had a reasonable basis for believing that Montoya was using his official office to induce them to make the payments. The prosecutor's closing argument, moreover, properly refers to the statements for this purpose.

■ The admission of evidence of Montoya's campaign expenditures was also properly within the court's discretion. We agree with the Government that the evidence is probative of Montoya's corrupt intent and motive for seeking unlawful payments in the form of campaign contributions.

■ Finally, the exclusion of testimony from other legislators regarding their support of the shrimp legislation was not an

---

**8.** As with the defense witness immunity question, Montoya's challenges to the court's evidentiary rulings relate principally to his erroneous Hobbs Act convictions. We nevertheless address these contentions in the event of retrial, and because the evidence also relates to predicate bribery acts underlying Montoya's money laundering and RICO convictions.

abuse of discretion. Evidence of the legislators' motives for supporting the legislation and opinions about the bill's merits is irrelevant to Montoya's own motives and intent in seeking the payments.

### III.

### CONCLUSION

Montoya's convictions for racketeering and money laundering under Counts I and IV of the indictment are AFFIRMED. Montoya's Hobbs Act convictions under Counts II, and VI through IX, are REVERSED. This case is REMANDED for resentencing on Counts I and IV.

Montoya's Motion for Bail Pending Appeal, filed June 6, 1991, is DENIED.

AFFIRMED in part; REVERSED in part; and REMANDED for resentencing.