64 F.3d 664
 Medicare & Medicaid Guide P 43,587
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Beryl Kate FRESHOUR, Phillip Grayor Tino, and Page Kilday
Tino, Defendants-Appellants.
 Nos. 94-5448, 94-5759, 94-5758.
 United States Court of Appeals, Sixth Circuit.
 Aug. 17, 1995.
 
 Before: CONTIE, RYAN, and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendants-appellants, Beryl K. Freshour, Phillip Tino and Page Tino, appeal their convictions and sentences for various counts of mail fraud and money laundering relating to Medicaid fraud. For the following reasons, the district court is affirmed in part and reversed in part.
 
 I.
 
 2
 Defendant Phillip Tino owned and operated a medical equipment business in Greenville, Tennessee, called Life Care Medical Sales and Rental (hereinafter "Life Care"). The business was founded in April 1985 and entered into a contract with the state of Tennessee, Department of Health and Environment, Medicaid Division, to be a Medicaid provider. The business was small and at no time had more than six employees. Mr. Tino was responsible for the overall management of the business. His wife, Mrs. Tino's role included ordering supplies and equipment, corresponding with Medicaid, paying bills, and dealing with customers. One of the employees, defendant Freshour, had the duty of obtaining prior authorizations from physicians and receiving orders for patients and placing orders for supplies and equipment.
 
 
 3
 In order for Life Care to provide a Medicaid recipient with supplies or equipment, Life Care had to receive prior authorization from Medicaid. An authorization form, which either had to be signed by a physician or have a prescription attached to it, had to be submitted to Medicaid listing the supplies or equipment needed for a particular patient. The requested supplies would then be approved by Medicaid and the forms would be returned to Life Care. After the authorization form was returned, Life Care was supposed to deliver the authorized equipment or supplies to the patient and submit a claim to Medicaid. Medicaid would then mail a weekly payment check along with remittance advices stating which claims were being paid by the check. This system was computerized and codes were assigned to all supplies and equipment that were reimbursable by Medicaid. One of the aspects of this system which made it susceptible to abuse was that the patient never received an "explanation of medical benefits form," telling the recipient what equipment a provider, such as Life Care, had billed to Medicaid for his benefit.
 
 
 4
 In early 1991, two Medicaid nurse-auditors, Ms. Flanagan and Ms. Ownsby, began an audit of Life Care in response to complaints from a foster parent. At this time Life Care had 240 Medicaid patients and the audit took a random sample of approximately 23% to review. Ms. Flanagan found many items which alerted her to indications of Medicaid fraud. She found delivery tickets that were missing, dates that had been altered, items which had arbitrarily been added to delivery tickets, and claims which had been submitted to Medicaid before the equipment had been delivered to the patient. Flanagan also found shortages between what was reportedly delivered and what was claimed by comparing the prior authorizations, the delivery tickets, and the claim forms. The audit also revealed that Life Care had improperly billed supplies and equipment under the wrong procedure codes in order to maximize reimbursement, and that Life Care sought reimbursement for quantities greater than what was actually delivered.
 
 
 5
 After the audit, defendants Phillip Tino, Page Tino and Beryl Freshour, were charged in an 87-count indictment. Counts 1 through 57 charged all three defendants with devising or aiding and abetting a scheme to defraud the Tennessee Medicaid program and for using the mails in furtherance of this scheme in violation of 18 U.S.C. Sec. 1341 and 18 U.S.C. Sec. 2. Counts 1 through 51 listed remittance advices and checks mailed by Medicaid to Life Care between December 1988 and May 1991 in payment of false claims. A remittance advice is a document issued by Medicaid which accompanies a payment check and lists the claims paid by that check. Counts 52 through 57 charged the mailings of specific claims to Medicaid between January and April 1992 in which the provider identification number given was the number for Life Care Medical Sales and Rentals of Morristown, Tennessee, which was a separate provider under the Medicaid program also owned by the Tinos. This identification number was used in an attempt to avoid an administrative suspension on payments of claims to the Greenville Life Care business after the audit had resulted in a temporary suspension.
 
 
 6
 The remaining counts of the indictment charged only the Tinos. Counts 58 through 63 charged violations of 18 U.S.C. Sec. 1956 and Sec. 1957 for money laundering by the issuance of six checks written between November 1989 and October 1990 on the account of Life Care at the Sovran Bank. The indictment alleged that the funds were deposited from payments on false claims. Counts 64 through 86 charged violations of 18 U.S.C. Sec. 1956, alleging that financial transactions by the Sovran Bank had been used from conduct involving mail fraud proceeds with the intent to promote the mail fraud scheme and with the knowledge that the checks involved the proceeds of unlawful activity and therefore constituted money laundering.
 
 
 7
 Count 87 of the indictment sought forfeiture of all property involved in the felony offenses charging violations of 18 U.S.C. Secs. 1956(a)(1)(A)(i) and 1957 pursuant to 18 U.S.C. Sec. 982 and 21 U.S.C. Sec. 853.
 
 
 8
 A trial began on December 6, 1993. General motions for judgment of acquittal were made at the conclusion of the government's proof and repeated at the end of trial. Mr. Tino was found guilty of 37 mail fraud counts as well as all the Secs. 1957 and 1956 counts. Mrs. Tino was found guilty of 12 mail fraud counts and all money laundering counts. Mrs. Freshour was found guilty on two counts of mail fraud. The jury subsequently returned a separate verdict forfeiting two real properties of the Tinos which were traceable to the Sec. 1957 violations.
 
 
 9
 Defendants filed motions for judgment of acquittal or new trials, which were denied by the district court. On March 21, 1994, the district court held a hearing to determine whether a conflict of interest had arisen between the Tinos, who were represented by lawyers from the same law firm. The district court found that there was no conflict of interest prior to or during trial, but that after trial when Mrs. Tino decided to divorce Mr. Tino, a conflict had developed. Therefore he permitted the Tinos' attorneys to withdraw and allowed the Tinos to obtain new attorneys.
 
 
 10
 Defendant Phillip Tino was sentenced to 66 months imprisonment and three years supervised release; Page Tino was sentenced to 51 months imprisonment and three years of supervised release; Beryl Freshour was sentenced to three years probation, including six months of home detention and restitution of not more than $5,670. All the defendants filed timely notices of appeal.
 
 II.
 
 11
 Defendants argue that the evidence was insufficient to support their convictions and the district court erred in denying their motions for judgment of acquittal.
 
 
 12
 The standard of review for a motion of acquittal or a new trial based on insufficiency of the evidence is that the evidence must be viewed "in the light most favorable to the government," United States v. White, 985 F.2d 271, 274 (6th Cir.1993), and the conviction is to be affirmed if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). To support a conviction for mail fraud under 18 U.S.C. Sec. 1341, the government has to prove: (1) the existence of a scheme to defraud; (2) which involves the use of mails; (3) for the purpose of executing the scheme. United States v. Merklinger, 16 F.2d 670, 678 (6th Cir.1994).
 
 A. Phillip Tino and Page Tino
 
 13
 Considering the elements of mail fraud, there was no serious dispute that the mailing of payment checks and remittance advices from Medicaid to Life Care furthered the scheme of Medicaid fraud. Although the Tino defendants argue that there was insufficient evidence in regard to individual claims, the documentary evidence demonstrated that material misrepresentations had been made on the claim forms submitted to Medicaid, including billed supplies or equipment that had not been furnished, the delivery of used equipment that was billed as new, and the use of wrong provider codes. The record also provided evidence of the requisite intent to defraud through evidence of knowing misrepresentations by the Tinos to Medicaid employees and by the false, forged, and altered documents contained in Lifecare's files created to conceal the fraudulent scheme. The core of the Tino defendants' defense was that even if false claims were submitted, the false claims were the result of mistake or accident and not the result of intentional fraud. We agree with the district court that it was the provence of the jury to make the credibility determinations in this regard. The jury did not believe the Tino defendnats' defense, finding it incredible that so many "alleged mistakes" could have been made unintentionally. The jury found incredible the Tino defendants' explanation as to why the "alleged mistakes" occurred. The intent to defraud was evidenced by the shear volume and variety of fraudulent claims submitted, undercutting the Tino defendants' contention that the false claims were the result of mistake or accident.
 
 
 14
 On appeal, Phillip Tino argues that a number of witnesses testified about the complexity of Medicaid regulations, supporting his defense that he had made honest mistakes. However, the jury found this defense incredible. Page Tino argues that even if she signed claims that were in error, there was insufficient evidence that she had an intent to defraud because of her lack of involvement in the business. Again it was the provence of the jury to make credibility determinations in this regard. Mrs. Tino argues that no evidence was submitted tying her to certain mailings. However, this argument has no merit. As the court in United States v. Johnson, 700 F.2d 699, 701 (11th Cir.1983) stated, when a defendant is proved to be a participant in a scheme to defraud and a document is mailed in furtherance of the scheme, the defendant may be convicted of mail fraud or as an aider and abettor even if she did not personally mail the document.
 
 
 15
 For these reasons, we find that the evidence was such that the jury could find, beyond a reasonable doubt, that the Tino defendants had devised, participated in, or aided and abetted a scheme to defraud the Tennessee Medicaid program and that the false claims were submitted intentionally to deceive Medicaid and not as the result of mistake or accident. The district court is affirmed on this issue in regard to the Tino defendants.
 
 B. Beryl Freshour
 
 16
 In regard to Beryl Freshour, a careful review of the trial transcript indicates there was insufficient evidence for her conviction on Counts 12 and 38 of the indictment for the following reasons.
 
 
 17
 Count 38 involved the billing of gauze pads under the A4555 code titled "dressings, primary surgical kit (sterile dressings, gauze, pads, etc.)." Mrs. Freshour's trial testimony that she was told by Mr. Balcik of Medicaid to bill gauze pads and sterile dressings under code A4555 is corroborated by Government Exhibit 568, a 1500 claim form in Mrs. Freshour's handwriting for "dressings (sterile)" with a prescription attached for 4 X 8 dressings and non-allergic tape. Since the claim form did not have a prior authorization, but was instead submitted with a doctor's prescription, the claim had to be reviewed manually to be approved by Medicaid. Mrs. Freshour argues that this claim form indicates she had no intent to defraud Medicaid because even though she knew the claim would be reviewed manually, she used code A4555 for authorization for "4 by 8 dressings." We agree this form indicates she was not trying to obtain higher reimbursement for gauze pads or sterile dressings by knowingly putting them under the wrong procedure code for surgical kits. Mrs. Freshour had no responsibility for billing and indicated to Medicaid that she was using code A4555 for sterile dressings and and gauze pads.
 
 
 18
 The United States argues that it was the testimony of L. Lamb, who purchased the Morristown store from Mr. Tino and for whom Mrs. Freshour worked briefly, and of L. Gentry, a billing clerk, that Mrs. Freshour told them that the dressings had been billed improperly. The United States has taken these statements out of context. The record indicates that Ms. Gentry asked Mrs. Freshour why Medicaid was not releasing money to Phil Tino after the audit and she replied that the Greenville store erred in billing for the gauze and overcharged Medicaid for the price of it. She made a similar remark to L. Lamb. These remarks are not sufficient evidence of an intent to defraud by Mrs. Freshour. She was not admitting responsibility for overcharging. Mrs. Freshour was explaining what she had been told as the reason for the suspension of the Greenville "Life Care" business and was not admitting that she had participated in the fraud. The remarks that the Greenville store had overcharged were made after the fact of the suspension, and there is no evidence in the record that Mrs. Freshour knowingly participated in the overcharging. She was not responsible for billing, did not know how to work the computer, and there is nothing in the record to indicate that she knew what price was being charged for the sterile dressings or gauze pads. Even when the evidence is construed in a light most favorable to the government, it is insufficient to indicate an intent to defraud by Beryl Freshour in regard to count 38 of the indictment. Therefore, the district court is reversed on this issue.
 
 
 19
 In regard to count 12 of the indictment involving the billing of KY jelly as skin gen, the record reveals the following. Mrs. Freshour testified that when she received a doctor's prescription for KY jelly to be used with a catheterization, she could find no code for KY jelly in the Medicaid manual. When she inquired with Medicaid about how to bill for KY jelly, she testified that she was told to bill KY jelly as skin gel. The record provides evidence that the same doctor prescribed skin gel and KY jelly interchangeably for catherizations. The government argues that a note in Mrs. Freshour's handwriting indicates that she told a Medicaid worker, who called to inquire about a particular claim for KY jelly, that she had dispensed small vials. The government argues that skin gel comes in vials and KY jelly comes in tubes so the only logical inference is that Mrs. Freshour misrepresented the product supplied in order to conceal the fraudulent nature of the claim. We do not agree with the government that this is the only logical inference or even a reasonable inference. Nurse Thompson of Medicaid testified at trial that skin gel also comes in tubes, not vials, and KY jelly comes in 3 gram foil packets for individual use. Mrs. Freshour testified that she was referring to these packets when she said she dispensed vials. Moreover, the inquiry from Medicaid was about the incorrect number (36 units of KY jelly had incorrectly been billed as 360), not about the type product dispensed. Mrs. Freshour was not responsible for the billing. The evidence also reflected the fact that the code in question was misunderstood in the industry and other Medicaid providers were also billing for KY jelly as skin gel. There was no specific exclusion of KY jelly in the Medicaid manual, as there was for other items, and there was no definition in the manual for skin gel, which was a reimbursable item. For these reasons, we do not find sufficient evidence of an intent to defraud Medicaid by using the provider code for skin gel for KY jelly. Thus, there was insufficient evidence of an intent to defraud on the part of Beryl Freshour in regard to count 12 of the indictment, and the district court is reversed on this issue.
 
 
 20
 To conclude, the convictions of Phillip and Page Tino for mail fraud are affirmed, but the conviction of Beryl Freshour is reversed.
 
 III.
 
 21
 We must also decide whether the evidence was sufficient to support Phillip Tino's and Page Tino's convictions under 18 U.S.C. Sec. 1957 and 1956(a)(1)(A)(i) for money laundering.
 
 
 22
 Mr. and Mrs. Tino contend that the evidence was insufficient to support their convictions under 18 U.S.C. Secs. 1957 and 1956(a)(1)(A)(i) for engaging in transactions in criminally derived property and in engaging in transactions with the proceeds of unlawful activity to promote an unlawful activity.
 
 
 23
 The Tinos argue that the United States failed to present sufficient evidence for the jury to conclude that they knew the checks involved in the alleged money laundering scheme were the "proceeds" of the mail fraud, rather that part of their legitimate business. This argument ignores the compelling circumstantial evidence of knowledge. See United States v. Heaps, 39 F.3d 479, 484 (4th Cir.1994) (both direct and circumstantial evidence can be used to establish knowledge of the unlawful source). In the present case, the government did not argue defendants engaged in transactions involving the proceeds of a third party's unlawful activity; it argued instead that Mr. and Mrs. Tino were conducting transactions involving the proceeds of their own mail fraud scheme. The Tinos' contention that they did not know whether a particular transaction involved the payments from false claims is undercut by evidence of the scope of the fraud. We find that the circumstantial evidence was such that the jury could find, beyond a reasonable doubt, that the Tinos knew that every payment from Medicaid represented in whole, or in part, payment for false claims and, therefore, every check drawn on the account, in whole or part, involved the proceeds.
 
 
 24
 Mr. Tino contends that the government failed to show that the transactions were designed to conceal or disguise the nature or source of the funds, relying on such cases as United States v. Sanders, 928 F.2d 940 (10th Cir.), cert. denied, 502 U.S. 845 (1991). However, the cases cited involved the "concealment" money laundering statute, 18 U.S.C. Sec. 1956(a)(1)(B)(i), not the "facilitating" money laundering statute, 18 U.S.C. Sec. 1956(a)(1)(A)(i), at issue in the present case. An intent to disguise or thwart detection of the source or purpose of the monies involved in the transactions is not a required element of money laundering based on promoting and carrying on a specified unlawful activity. United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir.1991). Page Tino's contention that the government failed to prove that the monies involved in the transactions were "proceeds" because the government did not trace the funds through an acceptable accounting method also has no merit. This court in United States v. Bencs, 28 F.3d 555, 562 (6th Cir.1994), cert. denied, 115 S.Ct. 915 (1995), held that Congress' choice of the word "involve" did not require the government to trace the funds involved in a financial transaction to a specific underlying unlawful transaction. The court reasoned that to hold otherwise would permit participants in unlawful activities to prevent conviction simply by commingling funds. In the present case, the evidence showed which checks from Medicaid in payment of fraudulent claims were deposited into the account, when the checks were deposited, any intervening transactions (through the account statements), and when the funds were withdrawn and in what amounts. We find this evidence sufficient for the jury to find that the checks at issue involved proceeds of the mail fraud.
 
 
 25
 Finally, Mrs. Tino contends that the evidence was insufficient to find that, by using the money from the false claims to pay the rent and utilities for Lifecare, she intended to promote the mail fraud scheme. However, direct evidence of a defendant's intent to promote the unlawful activity is seldom available, but can be inferred from the surrounding circumstances. United States v. Johnson, 971 F.2d 562, 566 (10th Cir.1992). In the present case, plowing the proceeds of the mail fraud back into the business permitted the Tinos to submit more false claims to Medicaid, the unlawful activity they intended to promote. The Johnson court found sufficient evidence of an intent to promote a fraudulent scheme where the defendant used the fraud proceeds to pay his home mortgage and the fraudulent scheme was conducted from an office in the home. The court reasoned that the jury could legitimately infer that the mortgage payment facilitated the fraudulent scheme by permitting the defendant to continue to use the home office. Id. Similarly, in the present case, rent and utilities payments for Lifecare enabled the submission of more false claims to Medicaid by continuing the operation of the business.
 
 
 26
 For these reasons, the district court is affirmed on this issue.
 
 IV.
 
 27
 Phillip Tino contends that the district court erred in denying his motion to dismiss for alleged prosecutorial misconduct during trial and that the government offered "other acts" evidence contrary to a evidentiary ruling of the district court. Defendant misunderstands this ruling, because the district court did not grant his motion in limine to exclude "other acts" evidence, as defendant contends. Instead, the district court effectively reserved ruling on this motion. Furthermore, the exhibits, which defendant Phillip Tino is contesting, are not "other acts" evidence under Federal Rule of Evidence 404(b), but are, in fact, documents providing a setting for the subsequent false claims. As the court in United States v. DeClue, 899 F.2d 1465, 1472 (6th Cir.1990) stated, evidence which is probative of the crime charged and does not solely concern uncharged crimes is not "other crimes" evidence. For this reason, the government did not violate any order of the district court, and the district court did not abuse its discretion in admitting the contested evidence, particularly in the absence of a contemporaneous objection. The district court is affirmed on this issue.
 
 V.
 
 28
 We will next address whether the district court erred in its instructions to the jury.
 
 
 29
 The Tinos argue that there were multiple items listed on remittance advices charged as fraudulent mailings and the government's proof at trial was that some of the items were substitute items, overcharged items, or undelivered items, demonstrating a scheme to defraud. They argue that the jury was not given a specific unanimity instruction requiring a jury to find that a particular item on the remittance advice was a part of the fraudulent scheme. Defendants argue that without a specific instruction, the jury could have disagreed about whether a particular item pertaining to a particular defendant was part of the scheme, but could still find the defendant guilty of that count in the indictment, because some of the jury found one item fraudulent and others found another item fraudulent.
 
 
 30
 The United States argues a jury need only agree on all of the elements of an offense, not necessarily on the means by which the elements were accomplished, relying on Schad v. Arizona, 501 U.S. 624 (1991) and United States v. Sanderson, 966 F.2d 184 (6th Cir.1992).
 
 
 31
 We agree with the United States. In Schad, the Supreme Court drew a distinction between "what 'fact[s] are necessary to constitute the crime,' and therefore must be proved individually, and what facts are mere means" of satisfying the mens rea of an offense. 111 S.Ct. at 2500. The defendant in Schad was charged with first degree murder and the state proved that he murdered the victim either with premeditation or in the course of committing a felony. Either of these means would support a conviction of first degree murder. The Court found that a lack of a specific jury instruction did not "fall beyond the constitutional bounds of fundamental fairness and rationality," since each of these mens rea states was only a means of committing the offense, not a separate element of the offense. Id. at 2504.
 
 
 32
 The Court of Appeals for the Sixth Circuit has used Schad to analyze whether multiple actus reus elements of an offense require a specific unanimity instruction. In Sanderson, 966 F.2d at 188, the defendant was charged with theft of government property, and the proof at trial showed that he stole paint and supplies and used state employees' time to do private contract work. He argued on appeal that the district court had erred in not requiring the jury to agree on which of these two acts he had committed in order to find him guilty of theft. This court affirmed the district court, finding that these were "components" of the larger, single fraudulent act of theft from a local government. Id. at 189.
 
 
 33
 In the present case, the jury was charged that in order to convict any of the defendants of any of the mail fraud counts, all the elements of mail fraud had to be proven beyond a reasonable doubt. Each of the first 51 mail fraud counts charged the Tino defendants with mailing a remittance advice to Medicaid. The remittance advices covered multiple items for which reimbursement was sought by the defendants.
 
 
 34
 The district court found that defendants were not denied due process when the jury was allowed to consider several means of carrying out the scheme to defraud Medicaid. We agree that the district court's conclusion comports with Schad. All the government needed to prove beyond a reasonable doubt was that the Tino defendants intentionally devised this scheme to defraud and that they used the mails to further the scheme. The fact that there was an allegation of a fraudulent surgical gauze charge and a fraudulent glove charge, for example, on the same remittance advice does not make the counts of the indictment duplicitous. Therefore, the district court did not err in its jury instructions in this regard.
 
 
 35
 We have carefully reviewed the Tinos' various other objections to the jury instructions and also find them without merit. No timely objections were made at trial except in regard to the aider and abettor jury instruction, and the jury instructions fairly apprised the jury of the elements of the offenses. The district court is affirmed on this issue.
 
 VI.
 
 36
 The Tino defendants contend that the criminal forfeiture of their property violated the excessive fines clause of the Eighth Amendment.
 
 
 37
 The district court found that the forfeitures were both remedial in nature and not greater than the fines the district court was authorized to impose under the applicable sentencing guidelines, and, therefore, the forfeitures were not unconstitutionally excessive.
 
 
 38
 We agree with this analysis. In Alexander v. United States, 113 S.Ct. 2766 (1993), the Supreme Court held that a criminal forfeiture could be the equivalent of a fine for the purposes of the Eighth Amendment's prohibition against imposing excessive fines, but left to the courts to determine on a case-by-case basis whether in the first instance, the forfeiture was excessive. The Court provided no clear guidance on how excessiveness is to be determined. Id. at 2776. In the present case, the Tinos contend that the forfeiture violated the proportionality requirement of the Eighth Amendment. However, the Fourth Circuit in United States v. Borromeo, 1 F.3d 219 (4th Cir.1993) stated that although a proportionality inquiry was appropriate for the forfeiture of property which facilitated an offense, such an inquiry may arguably not be necessary when the property was the proceeds of an illegal activity. Id. at 221. The Tino defendants contend that the United States did not show how the property at issue was traceable to violations of 18 U.S.C. Sec. 1957. However, the evidence showed that the properties were purchased with monies that the jury had found to be transactions conducted in violation of 18 U.S.C. Sec. 1957. Even if an excessiveness issue were implicated in the present case, we do not believe the forfeitures in the present case were excessive because the alleged value of the property forfeited was an amount well within the applicable guidelines fine range. The district court is affirmed on this issue.
 
 VII.
 
 39
 Mrs. Tino argues that the district court denied her due process in sentencing by characterizing her as a co-owner of the medical supply business, which is the subject of this case. We must affirm a district court's findings of fact at sentencing unless they are clearly erroneous. United States v. Robinson, 898 F.2d 1111, 1116 (6th Cir.1990).
 
 
 40
 We do not believe there was any factual error by the district court. Although there is no dispute that the provider identification number issued by Medicaid to Mr. Tino was for a sole proprietorship, the evidence and testimony at trial indicated that Mrs. Tino held herself out to be an owner and manager of the business. Most significantly in a letter from Mrs. Tino to Medicaid, she described herself as "the owner of Life Care Medical." Although Mrs. Tino was not technically listed as an owner of the sole proprietorship with Medicaid, the evidence indicates that she acted as such. Therefore, the district court's conclusion that Mrs. Tino's involvement was such warranting enhancement in regard to the money laundering offenses is not clearly erroneous, and the district court is affirmed on this issue.
 
 VIII.
 
 41
 The Tino defendants contend the district court erred in finding that counsel for Phillip and Page Tino did not have an actual conflict of interest such as to deny them effective assistance of counsel in violation of the Sixth Amendment.
 
 
 42
 After being charged with mail fraud and money laundering, the Tino defendants each retained counsel; however, the counsel were partners in the same law firm. Prior to an indictment being sought by the government in this case, the prosecution offered the Tinos a "deal." If Mr. Tino would plead guilty to a single felony violation relating to defrauding Medicaid, the government would not seek to bring charges against his wife. A letter from the Tino defendants' counsel indicated to the district court that both the Tinos rejected any deal which would require them to give up their health care businesses.
 
 
 43
 It is undisputed that a Federal Rule of Criminal Procedure, Rule 44(c) hearing was never conducted by the magistrate judge assigned to this case nor by the trial judge to determine whether Mr. and Mrs. Tino waived their right to independent counsel from separate firms.
 
 
 44
 At trial, the defense of the Tino defendants was that if any of the claims were wrong, it was due to mistakes or misinterpretation of the Medicaid rules. Both Tino defendants denied any intent to defraud Medicaid. None of the defendants' counsel cross examined the other defendants following their direct testimony, and, therefore, the defendants presented a solid line of defense against the government's charges.
 
 
 45
 Following the Tino defendants' convictions, the Tinos decided to divorce and defense counsel made a motion to withdraw due to a conflict of interest. After hearing testimony at the hearing about the Tinos' divorce and their disputes about property, the district court found that a conflict of interest had arisen after the trial in regard to the Tinos' assets and allowed the two counsel from the same law firm to withdraw. Each defendant then retained new counsel. They then each filed a motion for a judgment of acquittal or new trial based on an alleged ineffective assistance of counsel based on conflict of interest.
 
 
 46
 To support a claim of ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that it prejudiced his or her defense such that there was not a fair trial. Strickland v. Washington, 466 U.S. 668, 687 (1984). A conflict of interest can render counsel ineffective. United States v. Tatum, 943 F.2d 370 (4th Cir.1991). The United States Supreme Court has held "the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected the lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). Requiring or permitting a single attorney (or two attorneys from the same firm) to represent codefendants in a criminal case is not a per se violation of the constitutional guarantees of effective assistance of counsel. Holloway v. Arkansas, 435 U.S. 475 (1978). The trial court must look at the facts of a particular case and at each individual defendant to determine whether there is an actual conflict of interest and whether the conflict had caused counsel to be ineffective.
 
 
 47
 A defendant has a right to conflict-free representation under the Sixth Amendment. Federal Rule of Criminal Procedure 44(c) requires an inquiry into the possibility of a conflict in all cases where jointly-charged defendants retain the same counsel. Under Rule 44(c), the trial court must "inquire with respect to such joint representation and ... personally advise each defendant of the right to the effective assistance of counsel, including separate representation."
 
 
 48
 In the present case, it is uncontested that a Rule 44(c) inquiry did not take place as it should have.[1] However, the district court's failure to comply with Rule 44(c), without more, does not compel reversal. United States v. Crespo deLlano, 830 F.2d 1532, 1539-40 (9th Cir.1987). "To establish a [S]ixth [A]mendment violation, a defendant who raised no objection at trial must show that an actual conflict of interest affected [her] attorney's performance." United States v. Rico, 51 F.3d 495, 508 (5th Cir.1995). A conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing. Id. at 509. Thus, in the present case, it is necessary to determine whether an actual conflict existed between Mr. and Mrs. Tino's interests at the time of trial, not after the fact.
 
 
 49
 Their argument that the contingent nature of the plea bargain created a conflict of interest has no merit. At no time was there any indication that in regard to negotiating a plea agreement, either Mr. or Mrs. Tino was willing to become a witness against the other in order to get a plea in his or her favor. Such a plea would have required an admission of guilt. Both Tino defendants maintained their innocence, and Mrs. Tino stated that she did not believe her husband was guilty so she did not want him to plead guilty to one count in order to get her off, which was what the plea bargain offered. The present case is distinguishable from cases in which courts have found that an actual conflict of interest existed because there was disagreement between the defendants on how to proceed in regard to a plea bargain, and one defendant had persuaded a codefendant about whether or not to plead guilty. See Ford v. Ford, 749 F.2d 681 (11th Cir.) (brothers disagreed about pleading guilty), cert. denied 474 U.S. 909 (1985); Thomas v. Foltz, 818 F.2d 476 (6th Cir.1987) (counsel put pressure on one defendant to plead guilty in order to protect interests of remaining defendants), cert. denied, 484 U.S. 870 (1987); United States v. Gilliam, 975 F.2d 1050 (4th Cir.1992) (father and son disagreed about whether to plead guilty or not, and father persuaded son to change his mind to protect father's interest). In contrast to these cases, Mr. and Mrs. Tino did not disagree in regard to the plea bargain offered. Moreover, the plea was rejected so it cannot be said that one defendant overcame the will of another in forcing him or her to accept the plea.
 
 
 50
 Also there was no actual conflict of interest during the course of the trial. At no point did Mr. or Mrs. Tino indicate that they wished to admit some knowledge of the fraudulent scheme in an attempt to shift the blame for the organization and management of the scheme to another person. All the defendants agreed to and joined in a common defense that any improper claims were not submitted with fraudulent intent. The decision by defense counsel not to attempt to shift responsibility to a codefendant was simply a calculated decision not to weaken the common defense by attacking one another. In United States v. Holley, 826 F.2d 331 (5th Cir.1987), cert. denied, 485 U.S. 960 (1988), the court found no actual conflict between jointly represented defendants, indicating skepticism that there could be a constitutional violation when the only claim was that a defendant should have abandoned the common defense and invited reciprocal recrimination simply because the government's case was stronger against a codefendant. Id. at 334.
 
 
 51
 In the present case, neither Mr. or Mrs. Tino has adduced probative evidence or put forth probable arguments which counsel would have used in his or her favor if counsel were not constrained by the representation of the co-counsel from the same law firm. See United States v. Medel, 592 F.2d 1305 (5th Cir.1979) (in that it appeared that united front strategy may well have been the best strategy available, there was no conflict of interest in the joint representation).
 
 
 52
 Since neither Mr. or Mrs. Tino has demonstrated an actual conflict of interest, the district court is affirmed on this issue. Even though we believe the district court erred in not holding a Rule 44(c) hearing, this lapse is not grounds for reversal without an actual conflict of interest. Rico, 51 F.3d at 508. We affirm the district court on this issue, but for reasons other than those given by the district court. The court rationalized his failure to hold a Rule 44(c) hearing, stating that it had relied on the Tinos' counsel, who found no conflict of interest. The district court should not have abdicated its responsibility. However, the failure to hold a Rule 44(c) hearing is not reversible error, because the Tinos have not been able to demonstrate an actual conflict of interest. Therefore, the district court is affirmed on this issue.[2]
 
 IX
 
 53
 To conclude, the opinion of the district court is hereby AFFIRMED in part and REVERSED in part. The convictions and sentences of Phillip and Page Tino are affirmed. The conviction of Beryl Freshour is reversed.
 
 
 
 [1]
 In his initial denial of a request for such a hearing, the court held that the magistrate had held such a hearing. However, the district court was mistaken and the magistrate had not held a Rule 44(c) hearing
 
 
 [2]
 Mr. Tino also argues that the combined effect of the alleged errors, even if harmless individually, are such to have deprived him of a fair trial. However, since under the other issues, we have found no error, this argument has no merit